IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| ADAM KENNETH JACKSON | ) | CV 10-98-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| JASON JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I. Introduction

Plaintiff Adam Jackson brings this action under 42 U.S.C. § 1983 alleging

violations of his federal constitutional rights stemming from a June 2009 incident

in which Missoula County Deputy Sheriff Jason Johnson tasered Jackson on a

residential street. Jackson states federal claims for unlawful seizure and excessive

use of force.  The Amended Complaint also alleges pendent state claims for violation of Jackson's rights under the Montana Constitution, as well as a claim for punitive damages.  Deputy Johnson seeks summary judgment arguing he is entitled to qualified immunity on the federal claim and he asks that the Court decline to exercise supplemental jurisdiction over the state claim.

## II.  Factual Background

The facts, presented in the light most favorable to Plaintiff and non-movant Jackson, are as follows:  At 12:55 a.m. on June 10, 2009, Deputy Johnson was dispatched to the scene of a one-car accident near the corner of South 7th Street West and Como Drive in Missoula, Montana.  Upon arrival at the scene, Deputy Johnson observed two vehicles, one that had been crashed and one parked in the middle of the street.  Near the damaged vehicle were a man and two women.  The man claimed responsibility for the accident, telling Deputy Johnson, "It's me, I did it, I was driving, I am going to jail, take me to jail."  The two women told Deputy Johnson that they were not involved in the accident, but had stopped and gotten out of their car to see if anyone needed help.

Deputy Johnson then spotted the Plaintiff, Adam Jackson, 70 yards from the scene walking along the street in the opposite direction.  Jackson was not involved with the car accident and did not witness the accident.  Deputy Johnson ran after

Jackson. Jackson did not quicken his pace or attempt to flee from Deputy Johnson. When Deputy Johnson got within 15 to 20 feet of Jackson, he shined his flashlight on Jackson and ordered him to stop walking. Jackson, who was sober, stopped and turned to face Deputy Johnson, at which point Deputy Johnson ordered Jackson to get to his knees. Jackson put his hands in the air and asked Deputy Johnson why he was being stopped, stating he had done nothing wrong. Deputy Johnson responded by pulling out his taser and pointing it at Jackson, again ordering Jackson to get to his knees. Jackson kept his hands in the air and did not approach Deputy Johnson. Jackson again asked what he had done wrong, stated that Deputy Johnson had not told him he was under arrest, and asked Deputy Johnson to talk to him. Without warning Jackson or identifying himself as a sheriff's deputy, Deputy Johnson shot Jackson with his taser at a distance of 15 to 20 feet. Deputy Johnson then arrested Jackson on charges of obstructing a peace officer and resisting arrest.[1]

---

[1]Deputy Johnson's account differs from Jackson's in several ways. According to Deputy Johnson's Affidavit:

He did not know who was the driver of either car at the time he approached Jackson;

He "perceived Jackson to be intoxicated and belligerent";

He "suspected that Jackson was involved in the accident, or had committed a crime, or was attempting to flee the scene";

For the reasons set forth below Johnson's motion is granted with respect to the illegal seizure claim and denied in all other respects.

## III.  Analysis

**A.      Summary Judgment Standard**

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party.  Id. at 252.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered.  Id. at 248.

---

When he approached Jackson, Jackson "suddenly snapped around and stated in an aggressive and challenging manner, 'What the fuck do you want, I didn't do anything.'"

Jackson advanced toward Deputy Johnson, "yelling and posturing as if to fight."

Before tasering Jackson he identified himself as a sheriff's deputy, told Jackson to get to his knees four times, and warned Jackson that he would be tasered if he did not comply.

Johnson Affidavit, Doc. No. 17-1 at 2-3.

**B.     Qualified Immunity**

Qualified immunity shields a government actor from a suit for damages if the actor could have reasonably believed his conduct was lawful, in light of clearly established law and the information possessed by the official.  Anderson v. Creighton, 483 U.S. 635, 637-39, 641 (1987).  Not a mere defense to liability, qualified immunity entitles a government official "not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Accordingly, even when a constitutional violation occurs, "law enforcement officers nonetheless are entitled to qualified immunity if they act reasonably under the circumstances."  See KRL v. Estate of Moore, 512 F.3d 1184, 1189 (9th Cir. 2008) (citing Wilson v. Layne, 526 U.S. 603, 614 (1999)).

The United States Supreme Court outlined a two-step qualified immunity analysis in Saucier v. Katz, 533 U.S. 194 (2001), requiring district courts to first determine whether the officer's conduct violated a constitutional right.  Saucier, 533 U.S. at 201.  If there are disputed issues of material fact, the court must adopt the version of the facts presented by, and draw all reasonable inferences in favor of, the non-movant.  Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).  If no constitutional right was violated, the court need not inquire further.  If a constitutional violation has occurred, the court's second inquiry under Saucier is to

ask whether the law was "clearly established" at the time of defendant's alleged misconduct. <u>Saucier</u>, 533 U.S. at 201. In deciding if a right is clearly established, the Court must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202.

Recently the Supreme Court held that "while the sequence set forth [in <u>Saucier</u>] is often appropriate, it should no longer be regarded as mandatory." <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). Following <u>Pearson</u>, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson</u>, 129 S.Ct. at 818. Analysis pursuant to the sequence set forth in <u>Saucier</u> remains useful in many situations, <u>Pearson</u>, 129 S.Ct. at 818, and will be followed here, first as to the illegal seizure claim, and second as to the excessive force claim.

## 1. Illegal Seizure

"For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." <u>United States v. Chan-Jimenez</u>, 125 F.3d 1324, 1326 (9th Cir. 1997). The Fourth Amendment provides protection against two

types of seizures: investigatory stops and arrests. An investigatory stop, or Terry[2] stop, is a brief detention and interrogation and must be founded on reasonable suspicion. United States v. Miles, 247 F.3d 1009, 1012-13 (9th Cir. 2001). An arrest is a more intrusive detention and requires probable cause. Beck v. Ohio, 379 U.S. 89, 91 (1964).

Deputy Johnson contends he only seized Jackson one time, when he used his taser to arrest Jackson. Johnson relies on California v. Hodari D., 499 U.S. 621 (1991), to argue that his initial stop of Jackson was not a Fourth Amendment seizure because Jackson did not comply with Deputy Johnson's commands and therefore had not submitted to authority. Hodari D. involved a fleeing suspect who discarded a rock of crack cocaine while running from police officers. 499 U.S. at 623. The Supreme Court held that where there is a show of authority but the suspect does not yield in response, a seizure has not occurred. Id. at 626.

Hodari D. has no application here because in this instance Jackson yielded instantly in response to Johnson's instructions to stop. Once Jackson had turned to face Deputy Johnson and put his hands in the air, Jackson had submitted to authority and his freedom to walk away had been restrained. Jackson's refusal to get to his knees does not constitute non-compliance sufficient to rob the encounter

---

[2]Terry v. Ohio, 392 U.S. 1 (1968).

of its status as a seizure under <u>Hodari D.</u>  Consequently in this case, there are two

seizures to be considered, the <u>Terry</u> stop and Jackson's subsequent arrest.

The first question to resolve is whether the <u>Terry</u> stop was supported by

reasonable suspicion.  If Deputy Johnson had reasonable suspicion to make the

stop, it is then necessary to determine at what point the <u>Terry</u> stop became an

arrest.  After determining when the arrest occurred, it is further necessary to decide

whether the facts gave rise to probable cause at the moment the arrest occurs.  If

there is a constitutional violation at any stage, the next inquiry is whether the

rights violated were clearly established at the time of the incident.

### a.    Was There Reasonable Suspicion For a <u>Terry</u> Stop?

For a <u>Terry</u> stop to be lawful under the Fourth Amendment, the officer must

have "a reasonable suspicion supported by articulable facts that criminal activity

'may be afoot[.]'" <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (quoting <u>Terry</u>,

392 U.S. at 30).  "The quantum of proof needed for reasonable suspicion is less

than a preponderance of evidence, and less than probable cause." <u>United States v.

Tiong</u>, 224 F.3d 1136, 1140 (9th Cir. 2000).  Whether reasonable suspicion exists

for a Terry stop depends on the totality of the circumstances.  <u>United States v.

Arvisu</u>, 534 U.S. 266, 273 (2002).

Deputy Johnson had reason to conduct a <u>Terry</u> stop.  He encountered an

accident scene on a residential street at one o'clock in the morning. A man at the scene immediately claimed responsibility for the accident. Deputy Johnson observed a different man walking over 200 feet away from the scene in the opposite direction. Under the circumstances, it was reasonable for Deputy Johnson to have a suspicion about a person walking away from the scene of a wreck. Johnson had the unprompted confession he received upon arrival at the scene as another figure walked away.[3] A law enforcement officer in that position could reasonably decide that the admission of guilt came a bit too easily, and wonder whether it was an attempt to cover up the wrongdoing of another. And while the presence of a retreating figure in the distance might not be a basis for suspicion if the accident scene is a busy downtown intersection at midday, the presence of a passerby on a residential street at one o'clock in the morning would naturally arouse much more suspicion. Taking into account the totality of the circumstances, Deputy Johnson had reasonable suspicion to justify a brief investigatory stop. Deputy Johnson is entitled to summary judgment on Jackson's illegal seizure claim to the extent that claim alleges a <u>Terry</u> stop without

---

[3]In both his Opening Brief and Reply Brief, Deputy Johnson repeatedly describes Jackson as "hastening" or "walking hastily" away from the scene. <u>See</u>, <u>e.g.</u>, Doc. No. 16 at 15, Doc No. 20 at 3. There is no support in the record for such descriptions; the affidavits of both Deputy Johnson and Jackson merely state that Jackson was "walking." Doc. No. 17-1 at ¶ 4; Doc. No. 19-1 at ¶ 8.

reasonable suspicion.

### b. At What Point Did the <u>Terry</u> Stop Become an Arrest?

Before evaluating whether Jackson's arrest was supported by probable cause, it is necessary to decide when the arrest occurred. There is no dispute that the <u>Terry</u> stop had been converted to an arrest when Deputy Johnson used his taser on Jackson. The question is whether earlier events escalated the encounter from a <u>Terry</u> stop to an arrest.

Whether a Terry stop escalated to an arrest cannot be determined by reference to a "mechanical checklist," <u>United States v. Parr</u>, 843 F.2d 1228, 1231 (9th Cir. 1988), but must instead be judged according to the totality of the circumstances. <u>Gallegos v. City of Los Angeles</u>, 308 F.3d 987, 991 (9th Cir. 2002). In assessing the totality of the circumstances, a court must consider "both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." <u>Washington v. Lambert</u>, 98 F.3d 1181, 1185 (9th Cir. 1996) (citation omitted). "While certain police actions constitute an arrest in certain circumstances, e.g., where the 'suspects' are cooperative, those *same* actions may <u>not</u> constitute an arrest where the suspect is

uncooperative or the police have specific reasons to believe that a serious threat to the safety of one of the officers exists." Id. (emphasis in original).

In a typical Terry stop for which an officer has no reason to suspect danger, it is a Fourth Amendment violation for the officer to employ aggressive tactics such as drawing a weapon, forcing a subject to lie prone on the ground, and using handcuffs. United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir. 1990). "The police may not employ such tactics *every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime." Lambert, 98 F.3d at 1187 (emphasis in original). The Ninth Circuit has voiced the following examples of "special circumstances" under which intrusive techniques may be used to effectuate a Terry stop:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur. Clearly, some combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest.

Lambert, 98 F.3d at 1189.

A number of Ninth Circuit cases illustrate the types of conditions under which aggressive police actions during a Terry stop are warranted, and therefore

do not constitute an arrest.  See, e.g., United States v. Miles, 247 F.3d 1009, 1011-13 (9th Cir. 2001) (approaching suspect with guns drawn, forcing him to kneel and handcuffing him before conducting any investigation did not constitute an arrest where officers had a report of an armed suspect and were outnumbered three to two in the immediate vicinity); United States v. Allen, 66 F.3d 1052, 1055-57 (9th Cir. 1995) (intoxicated passenger forced to lie on the ground and handcuffed at gunpoint, held not to constitute an arrest where companion was combative, passenger was drunk and stop was preceded by a high-speed car chase); United States v. Alvarez, 899 F.2d 833, 836-839 (9th Cir. 1990) (no arrest where police approached with weapons drawn after receiving credible tip that subject possessed explosives); United States v. Greene, 783 F.2d 1364, 1366-68 (9th Cir. 1986) (police ordered subject seated in a car to place hands on the headliner and drew weapons when he did not immediately comply, held not to constitute an arrest where police had informant's report that the suspect was in possession of a pistol); United States v. Taylor, 716 F.2d 701, 708-09 (9th Cir. 1983) (no arrest when police handcuffed companion of suspected drug dealer at gunpoint where police had strong evidence of drug activity and received briefing that dealer and his companions should be considered dangerous); and United States v. Bautista, 684 F.2d 1286, 1287-90 (9th Cir. 1982) (handcuffing of two subjects justified, and not

an arrest, where police suspected subjects of armed robbery and knew that a third

suspect might still be in the vicinity).

By contrast, where officers have no reason to suspect danger, or where the

suspected offense is minor or non-violent, aggressive actions during an

investigative stop may constitute an arrest. For example, in <u>Del Vizo</u>, officers

stopped the driver of a van after surveillance indicated that the driver had just

completed a drug transaction. Police approached with weapons drawn, ordered

the driver out of the van, forced him to lie down on the street, and handcuffed him.

<u>Del Vizo</u>, 918 F.2d at 823. The Ninth Circuit held that the police conduct

constituted an arrest under the circumstances, and therefore required a showing of

probable cause. <u>Id.</u> at 824. The court of appeals went on to say that mere

suspicion of drug trafficking did not justify the extent of the restraints to effectuate

an investigative stop, noting that the driver was compliant and there was no

evidence suggesting he was dangerous. <u>Id.</u> at 825.

Handcuffing "substantially aggravates the intrusion and aggressiveness" of

a <u>Terry</u> stop, <u>Bautista</u>, 684 F.2d at 1289, but it is not a pre-requisite to finding an

arrest has occurred. "In fact, even markedly less intrusive police action has been

held to constitute an arrest when the inherent danger of the situation does not

justify the intrusive police action." <u>Lambert</u>, 98 F.3d at 1187. In <u>United States v.</u>

Ricardo D., 912 F.2d 337 (9th Cir. 1990), the Ninth Circuit found an arrest had occurred where officers took a non-fleeing, non-threatening juvenile subject by the arm, told him not to run, and placed him in a patrol car for questioning. In United States v. Robertson, 833 F.2d 777, 781 (9th Cir. 1987), officers were held to have arrested a female companion of a known methamphetamine manufacturer when they detained her at gunpoint, though they did not handcuff or touch her. The court noted that the police "had not the slightest indication that she was armed," and there was "[n]othing in the record suggest[ing] that the display of force was necessary to insure her compliance with a request to stop." Robertson, 833 F.2d at 781. In light of those facts the court concluded that "the purpose of the asserted 'Terry stop'–to allow the officers to investigate without fear of flight or violence–was not served by the intrusion imposed." Id. (citation omitted). The dissent in Robertson determined no arrest had occurred, but suggested an arrest likely would have occurred had the officers taken the further step of making the subject "prone out." Id. at 787 (Noonan, J., dissenting). Similarly, in United States v. Kraus, police officers confronted subjects with spotlights and weapons drawn, and ordered them to raise their arms and drop to their knees. 793 F.2d 1105, 1109 (9th Cir. 1986). The court of appeals determined these actions constituted an arrest where there was no information linking the subjects to a

14

crime, stating "the officers' commands led Kraus and Montgomery reasonably to believe that they had no choice but to raise their arms and drop to their knees. A reasonable person in this situation would have believed that he was not free to leave and was effectively under arrest." Id. at 1109.

In light of these cases, the Terry stop in this case became an arrest when Johnson drew his taser and pointed it at Jackson after Jackson failed to immediately comply with Deputy Johnson' first command that Jackson drop to his knees. Only one of the four Lambert factors is even arguably present. Deputy Johnson had no information that Jackson was armed. The stop did not closely follow a violent crime, and there was no reason for Deputy Johnson to believe a crime involving violence was about to occur. In fact, there was scant reason for Deputy Johnson to believe that Jackson was involved in any criminal activity at all. Jackson's actions at the scene did not support a reasonable belief that he presented a danger or a flight risk. The only conceivable fact supporting the intrusive action of pointing a taser at Jackson was Jackson's failure to immediately drop to his knees on the first command.

Under Robertson and Kraus, and in light of the four factors identified in Lambert, there is a credible argument to be made that the stop was converted to an arrest as soon as Deputy Johnson gave the initial order for Jackson to drop to his

knees. Any doubt was erased, however, when Deputy Johnson drew his taser.

Once he had drawn a weapon and ordered to Jackson to his knees, Johnson had

escalated the encounter to an arrest under the Fourth Amendment. Other than

Jackson's minimal act of non-compliance in refusing to act as a supplicant, Deputy

Johnson had no reason to suspect that he was dangerous, that he would attempt to

flee, or that he had committed or was planning to commit a violent offense.

Moreover, Jackson's non-compliance was partial; he had stopped walking when

asked and placed his arms in the air in response to the order to drop to his knees.

At that point, Jackson, like the subjects in Kraus, reasonably would have believed

he was not free to leave. See also Robertson, 833 F.2d at 781 (suspect approached

at gunpoint "was not free to 'choose between terminating or continuing the

encounter'") (quoting United States v. Johnson, 626 F.2d 753, 755 (9th Cir.

1980)). In the moment before he drew his taser, Deputy Johnson faced no

impediment to his achievement of the purposes of a Terry stop, i.e., the brief

investigatory detention and questioning of a subject without fear for his safety.

In each of the Ninth Circuit cases cited above the weapons drawn by

officers were guns rather than tasers. See, e.g., Lambert, 98 F.3d at 1188 ("[I]f the

police draw their guns it greatly increases the seriousness of the stop."). Unlike a

firearm, a taser does not constitute deadly force, and therefore the threatened use

16

of a taser cannot be deemed as severe an intrusion as the brandishing of a firearm. But the non-deadly nature of a taser does not render meaningless its use in deciding whether a <u>Terry</u> stop escalated to an arrest. The taser properly falls among that class of other non-deadly tactics, such as the use of handcuffs, that may "substantially aggravate[] the intrusiveness of an otherwise routine investigatory detention and [are] not part of a typical <u>Terry</u> stop." <u>Bautista</u>, 98 F.2d at 1289.

Moreover, it is unclear the degree to which the average person would appreciate the distinction between a taser and a firearm when the weapon is drawn from the holster of a uniformed officer in the dark of night. It suffices to say that an officer who draws his taser has significantly heightened the degree intrusion associated with the stop and the restraint placed upon the subject.[4] Taking the view of the facts most favorable to Jackson, Deputy Johnson's actions were not reasonably necessary under the circumstances to safely effectuate a <u>Terry</u> stop, and therefore constituted an arrest as of the moment he drew his taser.

---

[4]In <u>Lambert</u>, the Ninth Circuit quoted with approval the Seventh Circuit's observation that "[i]t would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity." 98 F.3d at 1188-89 (quoting <u>United States v. Serna-Barreto</u>, 842 F.2d 965, 967 (7th Cir. 1988)). It would be only marginally less disturbing to our constitutionally rooted notions of individual liberty if police had the freedom to conduct every investigatory stop from behind a drawn taser.

### c. Did Deputy Johnson Have Probable Cause to Arrest Jackson When He Drew His Taser?

If Deputy Johnson did not have probable cause when he drew his taser, his arrest of Jackson was a false arrest in violation of the Fourth Amendment. Lambert, 98 F.3d at 1186. "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." Dubner v. City and County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001). Reasonable suspicion may ripen into probable cause based on events that occur after the initial investigative stop. Greene, 783 F.2d at 1368 (quoting United States v. Medina-Gasca, 739 F.2d 1451, 1453 (9th Cir. 1984)).

Deputy Johnson asserts he had probable cause to arrest Jackson because "[Jackson's] non-compliance interfered with Johnson's ability to accomplish his lawful investigation and, at some point, became a crime." Def.'s Reply Brief, Doc. No. 20 at 5. Jackson was charged with two offenses under Montana law, resisting arrest and obstructing a peace officer. Johnson Affidavit, Doc. No. 17-1 at 3. A person commits the offense of resisting arrest under Mont. Code Ann. § 45-7-301 if he "knowingly prevents or attempts to prevent a peace officer from effecting an arrest," either by use or threat of force or violence, or by any other

means that places another person at risk of physical harm. A reasonable law enforcement officer could not have believed there was probable cause to arrest Jackson for resisting arrest. What Johnson espouses is plenary authority to arrest so an office is never wrong in making an arrest. Jackson did not use or threaten violence, and Deputy Johnson had no reason to perceive a risk that he or anyone else would suffer physical injury due to Jackson's actions.

That leaves obstructing a peace officer as the lone offense for which Deputy Johnson might have had probable cause to arrest Jackson. Under Mont. Code. Ann. § 45-7-302(1), "A person commits the offense of obstructing a peace officer or public servant if the person knowingly obstructs, impairs, or hinders the enforcement of the criminal law, the preservation of the peace, or the performance of a governmental function, including service of process." Under Jackson's version of the facts, the only conduct that conceivably could have given rise to probable cause was Jackson's failure to comply with Deputy Johnson's first command to drop to his knees. The question is whether the failure to immediately comply with an officer's command to assume a supplicant's position during an investigative stop is a violation of Mont. Code Ann. § 45-7-302.

The Montana Supreme Court addressed the question in <u>City of Kalispell v. Cameron</u>, 46 P.3d 46 (Mont. 2002). The defendant in <u>Cameron</u> was a passenger in

a truck that two officers had observed driving erratically.  Id. at 46.  After the

truck parked at a restaurant, the officers approached to investigate, one officer

confronting the driver on the driver's side of the truck and another confronting the

defendant on the passenger side.  Id. at 46-47.  As the defendant exited the truck

to enter the restaurant the officer called to him and told him to get back in the

truck.  Id.  The defendant did not comply, telling the officer he was going into the

restaurant to eat.  Id. at 47.  The officer repeated the command, and the defendant

responded by swearing at the officer and turning to enter the restaurant.  Id.  At

that point the officer forced the defendant against the truck in a "control position"

and handcuffed him.  Id.  The defendant charged with obstructing a peace officer

in violation of Mont. Code Ann. § 45-7-302.  He was convicted following a jury

trial after his motion for directed verdict failed.

On appeal, the Montana Supreme Court reversed the lower court and

directed a judgment acquitting the defendant, holding that mere non-compliance

with a police officer's command is not obstruction unless it is done with the

knowledge that non-compliance will hinder the officer's investigation.  The court

explained:

> Sections 45-2-101(34) (statutory definition of "knowingly") and
> 45-7-302(1), MCA, require that an individual obstructing a peace
> officer must engage in conduct under circumstances that make him or

her aware that it is highly probable that such conduct will impede the performance of a peace officer's lawful duty. In other words, the City had to prove that Cameron was aware that his conduct would hinder the execution of the Officers' duties.

We conclude that Cameron did not obstruct the Officers. Brenden testified that he arrested the driver without incident and was not impaired by Cameron. Moreover, Brenden testified that he did not require Zimmerman's assistance to arrest the driver. Finally, there was no reason for arresting Cameron and he had no reason to know why he was being investigated or arrested.

Cameron, 46 P.3d at 47.

Like the defendant in Cameron, here Jackson had no reason to know why he was being investigated and he was not informed of the purpose of the stop by Deputy Johnson. This was despite Jackson's asking Johnson what he did wrong. Jackson did not hinder Deputy Johnson's ability to investigate, as Jackson had his arms raised and in fact claims he was inviting questioning. In light of Cameron, Deputy Johnson did not have probable cause to believe Jackson's conduct was obstruction of a peace officer under Mont. Code Ann. § 45-7-302.

This result is consistent with the Ninth Circuit's decision in Mackinney v. Nielsen, 69 F.3d 1002 (9th Cir. 1995). In Mackinney, the plaintiff was arrested for obstruction for continuing to write on a sidewalk with chalk after officers told him to stop. 69 F.3d at 1004. The plaintiff filed a § 1983 action alleging false arrest, and the district court granted summary judgment for the defendants. The

court of appeals held that the officers did not have probable cause to arrest the plaintiff for the offense of obstructing a peace officer in California, citing California case law in which outright refusal to comply with police commands was held not to constitute obstruction under the state statute.  Id. at 1006.  In concluding its analysis, the Ninth Circuit panel stated, "Of course, people must obey the police in most situations.  But here, the police overreacted to Mackinney's momentary disobedience."  69 F.3d at 1006.[5]

Cameron was decided in 2002, well before the events at issue here took place.  Since then, it has been clearly established under Montana law that mere momentary non-compliance with a peace officer's commands is not obstruction under Mont. Code Ann. § 45-7-302.  At a minimum, there exists a triable issue of fact regarding whether, under Jackson's allegations, Deputy Johnson unreasonably violated clearly established law when he arrested Jackson.  Deputy Johnson has failed to carry his summary judgment burden with respect to Jackson's false arrest

---

[5]Deputy Johnson's reliance on Hiibel v. Sixth Judicial District Court of Nevada, Hombolt County, 542 U.S. 177 (2004), is misplaced.  Although Deputy Johnson's Reply Brief characterizes the Nevada statute at issue in Hiibel as a "stop and frisk" statute "which is similar to Montana's," Doc. No. 20 at 5, the Nevada law is in fact a "stop and identify" statute which requires the subject of a Terry stop to disclose his or her identity at the request of a peace officer–a feature not found in the Montana stop and frisk statute, Mont Code Ann. § 46-5-401.  Hiibel, 542 U.S. at 181.  In Hiibel, the Supreme Court held that failure to respond to such a request is grounds to arrest the subject of a Terry stop for violation of the "stop and identify statute."  Id. at 187-89.  Hiibel has no application here, because the subject in Hiibel committed a clear violation of state law in the presence of the arresting officer.

claim, and his motion for summary judgment is denied as it relates to that claim.

**2.     Excessive Force**

Deputy Johnson argues that he is entitled to qualified immunity on the excessive force claim because the law on excessive force involving tasers was not clearly established when this incident occurred on June 10, 2009.  Deputy Johnson does not attempt to argue that the quantum of force he used was constitutionally permissible, instead urging the Court to skip the excessive force inquiry and proceed directly to the question whether the law was clearly established.  If that approach is followed, Deputy Johnson argues, he is entitled to qualified immunity under the Ninth Circuit's recent decision in <u>Bryan</u>.

**a.     Did Deputy Johnson Use Excessive Force?**

An officer will not be found to have used excessive force so long as his actions are objectively reasonable in light of the facts and circumstances confronting him.  <u>Graham v. Connor</u>, 490 U.S. 386, 395-97 (1989).  In assessing the reasonableness of an officer's use of force, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  <u>Bryan</u>, 630 F.3d at 823 (internal quotation marks omitted).

The nature and quality of the intrusion in this case is the use of a taser,

which the Ninth Circuit has deemed an intensely painful and frightening blow. Bryan, 630 F.3d at 825-26. The Bryan panel held that a taser constitutes an "intermediate, significant level of force[.]" Id. at 826.

The Court must balance that intrusion against the countervailing governmental interests at stake. Three core factors are used to assess the government's interest in the use of force: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Bryan, 630 F.3d at 826 (quoting Graham, 490 U.S. at 396). These factors are not exclusive; in each case, any factor that is appropriate under the specific circumstances should be considered. Bryan, 630 F.3d at 826. Such factors include, where relevant, whether the officer warned the subject before using force, and whether the officer considered less intrusive means to effect arrest. Id. at 831.

When considered in the context of the Graham factors, the governmental interests at issue here do not justify the use of a taser in this case. Jackson had his arms raised and he did not approach or otherwise threaten Deputy Johnson, who was 15 to 20 feet away. Jackson twice asked the officer what he had done wrong, stated that Deputy Johnson had not told him he was under arrest, and asked Deputy Johnson to talk to him. To the extent that Jackson's failure to drop to his

knees after two commands constituted resistance, his resistance was entirely passive. Furthermore there was nothing about the situation that could reasonably have caused Johnson to believe forcing Jackson to his knees was required for any reason including officer safety. The first Graham factor, severity of the crime, does not support any use of force. Assuming Jackson was in the wrong, the severity of his offense in this instance was *de minimis*, if indeed there was reason to suspect him of any offense at all. No fact gave rise to a reasonable suspicion he had committed or was about to commit a violent crime. As for the second Graham factor, Jackson did not pose an immediate threat to Deputy Johnson. Finally, Jackson did not actively resist arrest or attempt to flee. His minimal, passive resistance to an uncalled for order to get on his knees does not come close to justifying the use of a taser, particularly where Jackson had raised his arms and asked Deputy Johnson to tell him why he had been stopped, and Deputy Johnson did not warn Jackson that he would use the taser.

As alleged by Jackson, Deputy Johnson's use of force in this case was excessive under Graham in violation of the Fourth Amendment. With that determination it is necessary to turn to the second step in the qualified immunity analysis, i.e., whether the right violated by Deputy Johnson was clearly established in the law as of June 10, 2009.

## b. Did Deputy Johnson Violate Jackson's Clearly Established Rights?

The Ninth Circuit has conceded that the law on excessive force regarding the use of tasers was to some degree unsettled prior to its decision in <u>Bryan</u>. 630 F.3d at 833.[6] In <u>Bryan</u>, the driver of a car was stopped at an intersection when an officer stationed there to enforce seatbelt laws stepped in front of the car. <u>Id.</u> at 822. When the officer approached the driver's window and asked if the driver knew why he had been stopped, the driver stared straight ahead and said nothing. <u>Id.</u> The officer then instructed the driver to turn down the radio and pull over, and as the driver complied, he began to punch the steering wheel and repeatedly yell expletives. <u>Id.</u> The driver then exited the vehicle despite having been instructed by the officer to stay in the car. <u>Id.</u> The driver wore only boxer shorts and tennis shoes, and was visibly agitated. <u>Id.</u> He stood outside his car, yelling gibberish and pounding his thighs with his fists. <u>Id.</u> The court of appeals characterized the driver's behavior as a "bizarre tantrum." <u>Id.</u> at 832. The driver did not make any attempt to advance toward the officer. <u>Id.</u> at 822. Beholding the driver's conduct from 20 to 25 feet away, the officer drew and fired his taser without warning,

_____

[6]<u>Bryan</u> is one of three excessive force cases involving tasers decided by the Ninth Circuit in 2010. The court has granted rehearing en banc in the other two, <u>Brooks v. City of Seattle</u>, 599 F.3d 1018 (9th Cir. 2010), <u>rehr'g en banc granted by</u> 623 F.3d 911 (9th Cir. 2010), and <u>Mattos v. Agarano</u>, 590 F.3d 1082 (9th Cir. 2010), <u>rehr'g en banc granted by</u> 625 F.3d 1132 (9th Cir. 2010).

causing the driver to fall to the ground and suffer injuries to his face and teeth.  Id.

The driver filed a § 1983 action, and the district court denied the defendant's motion for summary judgment on qualified immunity.  On appeal, the panel concluded that the officer's use of the taser in Bryan was excessive under the Fourth Amendment because the situation did not call for an intermediate level of force.  630 F.3d at 832.  The court of appeals held that under the circumstances "the government had, at best, a minimal interest in the use of force against Bryan."  Id. at 831.  The court then went on to find that the officer was entitled to qualified immunity because prior to the Bryan opinion there had been no Ninth Circuit case declaring a taser to constitute an intermediate use of force.  Id. at 833.  In other words, while it was clearly established in the law that intermediate force was not reasonably called for in the situation, it was not clearly established that a taser constitutes intermediate force.  The effect of Bryan's qualified immunity analysis is that before the Bryan opinion, a police officer was entitled qualified immunity against any excessive force claim based on the use of a taser, provided that at least *some* degree of force was reasonable under the circumstances.  Whether Deputy Johnson is entitled to qualified immunity therefore turns on whether it was reasonably necessary to use any level of force under the circumstances.  It merits comment that law enforcement officers are not required to check in their common

sense when they check out their taser, regardless of the state of the law.

"Where there is no need for force, *any* force used is constitutionally unreasonable." Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1199 (9th Cir. 2000), vacated and remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Defense, 534 U.S. 801 (2001) (emphasis in original). Headwaters involved the use of pepper spray on peaceful protesters who had linked themselves together using steel locking devices while demonstrating on lumber company property and in a politician's office. The Ninth Circuit concluded that the use of pepper spray constituted excessive force in those circumstances, 240 F.3d at 1205-06, and re-affirmed its excessive force analysis on remand from the Supreme Court. See Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1131 (9th Cir. 2002) (holding the use of pepper spray was "plainly in excess of the force necessary under the circumstances"). The circuit faulted the officers for not considering less intrusive force because alternatives such as using a grinder to cut the locking devices or physically removing the protesters by carrying them were reasonable options to the force used. Headwaters, 240 F.3d at 1205.

Unlike Bryan and Headwaters, this is a case in which no force was reasonably necessary. In both Bryan (seat belt infraction) and Headwaters

(trespass), the officers had probable cause to believe a crime had been committed, and therefore were justified in effecting an arrest. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Michigan v. DeFillippo, 443 U.S. 31, 37 (2001). Deputy Johnson has no probable cause to arrest Jackson, so he was not entitled to use any force. When an officer illegally makes a false arrest, the "countervailing governmental interest" required by Graham is entirely absent. No level of force can be reasonably justified in such circumstances.

Viewing the facts in the light most favorable to Jackson, Deputy Johnson is not entitled to qualified immunity on the excessive force claim because tasering Jackson to effectuate a false arrest constituted a use of force where none was necessary, and no reasonable officer could have concluded otherwise. Deputy Johnson's motion for summary judgment on the excessive force claim is denied.

## IV. Conclusion

Based on the foregoing, Deputy Johnson's motion for summary judgment (dkt #15) is GRANTED with regard to Jackson's illegal seizure claim based on the absence of reasonable suspicion for an investigative stop, and DENIED in all other respects.

Dated this 18th day of July, 2011.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT